## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

JEREMIAH J. TROMBLY,

      Plaintiff,

                                        Case No. 11-13477

v.                                      Hon. Gerald E. Rosen

FIDELITY WORKPLACE SERVICES LLC,
*et al.,*

      Defendants.

_____/

## OPINION AND ORDER REGARDING
## CROSS-MOTIONS TO AFFIRM OR REVERSE
## THE DECISION OF THE PLAN ADMINISTRATOR

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on _____ March 7, 2013 _____

PRESENT:  Honorable Gerald E. Rosen
                    Chief Judge, United States District Court

## I.  INTRODUCTION

In the present suit, Plaintiff Jeremiah J. Trombly challenges a decision denying his

request for so-called "interim supplement" benefits under a retirement plan offered to

salaried employees of Defendant General Motors Corporation.  In his five-count second

amended complaint, Plaintiff alleges that these benefits are owed to him either (i) under

the terms of the plan itself, (ii) by virtue of breaches of duties owed to him by Defendant

Fidelity Workplace Services, LLC and/or the Defendant plan administrator in their

1

purported roles as plan fiduciaries, (iii) under the theory of equitable estoppel, or (iv)

under state-law theories of breach of contract or misrepresentation.  This Court's subject

matter jurisdiction over this case rests upon Plaintiff's claim for benefits under an

employee welfare benefit plan governed by the Employee Retirement Income Security

Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*

Presently before the Court are Plaintiff's and Defendants' cross-motions to reverse

or affirm, respectively, the plan administrator's determination that Plaintiff was not

entitled to "interim supplement" benefits under the General Motors retirement plan.[1]

Defendants argue, first and foremost, that under the plain language of the plan, Plaintiff's

---

[1]To be accurate, while the Court refers throughout this opinion to a motion brought by the "Defendants," this motion has actually been filed by only two of the six parties named as defendants in Plaintiff's second amended complaint, General Motors LLC and Fidelity Workplace Services LLC.  Of the four other parties named as defendants in the second amended complaint, two of these parties — Motors Liquidation Company, the successor to Defendant General Motors Corporation, and Fidelity Investments Employer Benefits Services Corp., which Plaintiff apparently views as another name under which Defendant Fidelity Workplace Services, LLC does business — have never appeared in this action, and Plaintiff has taken no steps to pursue the entry of a default or default judgment as to either of these two defendants.  Another defendant, identified in the second amended complaint as "General Motors Employee Benefits Plan Administrator/Board and Committee," is evidently meant to refer to the Employee Benefit Plans Committee that addressed Plaintiff's claim for benefits and subsequent administrative appeals.  The sixth and final party named as a defendant, General Motors Corporation, apparently is no longer a distinct, going concern, but instead now does business in the name of Motors Liquidation Company.  It appears from the record that these latter two defendants have neither been served with nor filed answers to the second amended complaint.

Amidst all this uncertainty as to which of the six entities named as defendants are proper parties to this suit and whether these entities have been properly identified, it appears that one arguably necessary party — *i.e.,* the ERISA plan itself — has not been named as a defendant.  Nonetheless, the Court finds it unnecessary to sort through this considerable confusion as to the proper defendants and their correct identities, because this does not impact the grounds upon which the Court resolves the parties' cross-motions.

2

election of an early retirement date of December 1, 2007 left him just short of the 85 points — calculated by adding age at retirement and years of credited service — needed to be eligible for the "interim supplement" benefits he seeks in this suit.  Defendants further contend (i) that Plaintiff's breach of fiduciary claim is subject to dismissal as a mere repackaging of his claim for benefits under an ERISA plan, (ii) that Plaintiff cannot establish several of the elements of a viable ERISA claim of equitable estoppel, and (iii) that Plaintiff's state-law claims are preempted by ERISA.  In response, and in support of his own cross-motion, Plaintiff argues primarily that he is entitled to relief in light of the alleged misrepresentations made to him by representatives of Defendant Fidelity, as well as omissions of material facts, during telephone conversations in which Plaintiff sought benefit information bearing upon his decision whether to take early retirement.

The parties' cross-motions have been fully briefed and are ready for decision. Upon reviewing the parties' submissions, the pleadings, and the administrative record, the Court finds that the relevant allegations, facts, and legal arguments are adequately presented in these materials, and that oral argument would not significantly aid the decisional process.  Accordingly, the Court will decide the parties' motions "on the briefs."  *See* Local Rule 7.1(f)(2), U.S. District Court, Eastern District of Michigan.  This opinion and order sets forth the Court's findings and rulings on these cross-motions.

## II.  <u>FACTUAL AND PROCEDURAL BACKGROUND</u>[2]

### A.   The Parties

Plaintiff Jeremiah J. Trombly worked for Defendant General Motors Corporation
from 1966 to 1992.[3]  While employed at GM, Plaintiff accrued 25 years and 9 months of
credited service under the General Motors Retirement Program for Salaried Employees
(the "GM Plan," or the "Plan").  In 1992, Plaintiff left GM to work for Electronic Data
Systems ("EDS").[4]  Under the GM Plan, Plaintiff retained his credited service upon
moving to EDS, but he did not accrue any additional credited service during his time at
EDS.

At all pertinent times, GM was the sponsor and administrator of the Plan.  The

---

[2]In *Wilkins v. Baptist Healthcare System, Inc.,* 150 F.3d 609, 619 (6th Cir. 1998), the
Sixth Circuit held that neither summary judgment nor a bench trial provides an appropriate
procedural basis for resolving claims to recover benefits under an ERISA plan.  Rather, the court
suggested that district courts generally should review challenged benefit denials "based solely
upon the administrative record, and [should] render findings of fact and conclusions of law
accordingly."  *Wilkins,* 150 F.3d at 619.  Thus, for purposes of deciding Plaintiff's claim for
benefits in this case, the following recitation of facts should be viewed as the Court's factual
findings.  As it happens, though, because the parties are essentially in agreement as to the
pertinent facts, there is little (if any) distinction here between a *Wilkins* approach and a
traditional summary judgment analysis, under which the record must be viewed in a light most
favorable to the nonmoving party.

[3]After General Motors Corporation filed for Chapter 11 bankruptcy reorganization in
2009, it was renamed "Motors Liquidation Company" and substantially all of its assets were sold
to the newly created General Motors LLC.  All three of these entities have been named as
defendants in Plaintiff's second amended complaint.  Throughout the remainder of this opinion,
the Court will refer interchangeably to these three entities as "GM," unless it is necessary to
distinguish more specifically among the roles of these three entities in the events giving rise to
this suit.

[4]At the time, EDS was owned by GM.

4

Defendant GM Employee Benefit Plans Committee ("EBPC") was given authority under the GM Plan to hear appeals from decisions of the plan administrator denying claims for benefits.  (*See* Admin. Record at 351, Plan at 210.)  Under the Plan, GM as plan administrator had "full authority to construe, interpret and administer" the Plan, and EBPC likewise was "delegated discretionary authority to construe, interpret, and administer" the Plan.  (*Id.*)  The Plan further provided that "[t]he decision of the EBPC [on administrative appeal] shall be final and binding upon [GM] and the participant or beneficiary."  (*Id.*)

**B.      Plaintiff Elects to Take Early Retirement from EDS**

In the fall of 2007, EDS extended an early retirement offer to Plaintiff.[3]  Plaintiff was advised that he had to accept this offer by October 30, 2007, and that his last day of work under the offer would be December 1, 2007.

As the deadline for acceptance of this offer approached, Plaintiff made a number of telephone calls to the GM Benefits and Service Center (the "Center"), a service operated by Defendant Fidelity Workplace Services, LLC ("Fidelity") on GM's behalf to address questions about GM employee benefits.  Although these calls are discussed in greater detail below, as pertinent to the Court's analysis of Plaintiff's claims and the parties' arguments in their cross-motions, Plaintiff asserts that the Fidelity representatives he spoke with gave him misleading, inaccurate, or incomplete information about the

---

[3]By this time, EDS was no longer affiliated with GM.

5

pension benefits he would receive under the GM Plan if he accepted EDS's offer of early retirement. Moreover, while Plaintiff repeatedly stressed in these phone calls that time was of the essence, and that he wished to receive an estimate of his GM benefits before making a decision on EDS's offer, Plaintiff maintains that no written estimates were provided to him until after the October 30, 2007 deadline for acceptance of this offer.

In late October of 2007, Plaintiff submitted the necessary paperwork to accept EDS's offer of early retirement. Pursuant to this offer, Plaintiff's last day of work at EDS was November 30, 2007, and he was deemed to have retired from EDS on December 1, 2007.

**C.      Following His Early Retirement, Plaintiff Is Given Conflicting Information Regarding His Eligibility for Interim Supplement Benefits Under the GM Plan, and He Is Ultimately Advised That He Is Not Eligible for These Benefits**

Notwithstanding his early retirement from EDS, Plaintiff retained the option to immediately commence the pension benefits he had accrued during his years of employment at GM, or to instead defer the payment of these GM Plan benefits to a later date. Thus, in the months immediately following his early retirement, Plaintiff continued to contact the Center to seek additional information regarding the possible commencement of his GM pension benefits.

Unfortunately, Plaintiff received conflicting information in the course of these communications with Fidelity representatives, particularly with respect to his eligibility for so-called "interim supplement" benefits under the GM Plan. In correspondence dated January 14, 2008, for example, the Center estimated Plaintiff's monthly pension benefits

6

under the GM Plan as including a $768.49 "interim supplement" payment that he would

receive until he reached the age of 62 years and 1 month, with this supplemental benefit

scheduled to end on January 1, 2011.  (*See* Pl. Record at 30-31, 1/14/2008 Benefit

Modeling Statement at 4-5;[4] *see also* Admin. Record at 37-39, 2/6/2008 Letter (providing

"methodology and values used to calculate" Plaintiff's estimated benefits, and

incorporating this same $768.49 interim supplement).)  A subsequent February 12, 2008

statement of Plaintiff's estimated benefits, in contrast, omits this "interim supplement"

payment, and more generally reflects a considerably lower monthly benefit payment.

(*See* Pl. Record at 56-57, 2/12/2008 Benefit Modeling Statement at 4-5.)[5]

---

[4]Apart from an administrative record that has been mutually agreed to by the parties, Plaintiff has submitted a separate set of materials — including, most notably, transcripts of his phone calls with Fidelity representatives at the Center — that were not a part of the record considered by the GM Plan administrator and the EBPC in the course of their decisions on Plaintiff's initial claim for benefits and administrative appeals.  Throughout this opinion, the Court will use the notation "Pl. Record" to refer to this additional evidence.  Defendants argue that these additional materials should be excluded from the Court's review as it resolves the parties' cross-motions, and the Court addresses this issue below.

[5]Under the earlier January 14, 2008 benefit modeling statement, if Plaintiff chose the surviving spouse coverage annuity, he was estimated to receive a monthly benefit payment of $2,568.18 until the age of 62 years and 1 month, with this figure decreasing to $2,028.45 per month once the interim supplement benefit ended on January 1, 2011.  (*See* Pl. Record at 31.) Under the February 12, 2008 benefit modeling statement, in contrast, the estimated monthly payment Plaintiff would receive if he elected the surviving spouse coverage annuity was $1,347.41.  (*See id.* at 57.)

As revealed in the course of the parties' briefing on their cross-motions, this difference in the Center's estimates was not attributable solely to the presence or absence of interim supplement benefits.  Rather, part of this discrepancy was due to the use of an erroneously high "age reduction factor" to reduce Plaintiff's benefits in light of his decision to commence these benefits prior to the age of 62.  (*See* Admin. Record at 102, 7/12/2010 Letter at 3.)  During the pendency of this suit, the GM Plan administrator corrected this error and issued a retroactive payment to Plaintiff to account for this adjustment in the age reduction factor.  (*See* Defendants'

In the midst of these communications, Plaintiff completed paperwork on January 28, 2008 stating that he wished to begin receiving pension benefits under the GM Plan. (*See* Admin. Record at 33, 1/28/2008 Retirement Election Authorization.)  As the Center processed this election, it determined that its earlier estimates of Plaintiff's pension benefits had been erroneously based on an EDS termination date of February 29, 2008, (*see* Pl. Record at 29, 1/14/2008 Benefit Modeling Statement at 3 (reflecting termination date of 2/29/2008 as one of the assumptions under which benefits were estimated); *see also* Admin. Record at 37, 2/6/2008 letter (explaining that estimated benefits were calculated "using a termination date of 2/29/2008")), as opposed to Plaintiff's actual last date of work, November 30, 2007.[6]  The Center then issued a revised benefit modeling

---

6/29/2012 Response, Ex. 1, Orpin Decl. at ¶¶ 5-7.)  The effect of this recalculation was that Plaintiff received $1,831.24 in monthly benefits from June 1, 2008 to December 1, 2010, and that his monthly benefits increased to $2,041.38 after January 1, 2011.

   Notably, this latter figure is close to (but somewhat larger than) the comparable amount in the January 14, 2008 benefit modeling statement, which estimated that Plaintiff would receive $2,028.45 per month after January 1, 2011.  (*See* Pl. Record at 5; *see also* Plaintiff's 5/29/2012 Motion at ¶ 36 (identifying this $2,028.45 amount as the monthly benefit Plaintiff was entitled to receive after January of 2011 but for Defendants' allegedly "wrongful acts and omissions").)  The upshot, then, is that the parties' differing views as to Plaintiff's entitlement to interim supplement benefits — a benefit which, by its terms, is payable only until a retiree reaches the age of 62 years and 1 month, (*see* Admin. Record at 74) — constitutes the sole material point of contention in this suit, despite (and contrary to) the assertion of Plaintiff and his counsel that Defendants have paid Plaintiff only "$1,347.41 a month since August of 2008" and have steadfastly "den[ied] that the greater amount" set forth in the January 14, 2008 benefit modeling statement "should be paid [to Plaintiff] after age 62," (Plaintiff's 5/29/2012 Motion at ¶¶ 36-37).

   [6]The record is unclear as to how the Center arrived at a mistaken termination date of February 29, 2008 in calculating its estimate of Plaintiff's benefits.  This erroneous information apparently resulted from misunderstandings or miscommunications during Plaintiff's telephone conversations with Fidelity representatives.

statement and retirement election confirmation statement to reflect the correct EDS termination date and omit the "interim supplement" component of Plaintiff's estimated benefits.  (*See* Pl. Record at 55-60, 2/12/2008 Benefit Modeling Statement; Admin. Record at 81-86, 6/6/2008 Retirement Election Confirmation Statement.)  On June 19, 2008, Plaintiff signed and returned an acknowledgment confirming that he still wished to begin receiving pension benefits under the GM Plan, (*see* Admin. Record at 84), despite the Center's reduced estimate of these benefits.  Plaintiff then began receiving pension benefits under the GM Plan, with an effective benefit commencement date of June 1, 2008.

**D.      Plaintiff Pursues His Administrative Remedies in an Effort to Collect the Additional "Interim Supplement" Component of His Pension Benefits**

Over the next several months, Plaintiff made a number of inquiries as to why his estimated pension benefits had been reduced and he was no longer deemed eligible for the "interim supplement" payment that had been included in previous benefit estimates he had received from the Center.  In response, Plaintiff was advised that his ineligibility for "interim supplement" benefits was due to his failure to accrue the requisite 85 "points" prior to his retirement from EDS, with these points calculated as the sum of Plaintiff's credited years of service for GM (25 years and 9 months, or 25.75) plus his age as of the date he stopped working for EDS (59.04).  (*See* Admin. Record at 92, 5/13/2009 Letter.) The Center then explained in a subsequent letter that its earlier benefit calculations, which had included the "interim supplement" amount, had rested on the incorrect assumption

that Plaintiff had continued working until February 29, 2008. (*See id.* at 95, 11/4/2009

Letter.) Had that been the case, Plaintiff's years of service (25.75) plus his age at the date

of his retirement (59.25) would have totaled 85 points, and Plaintiff would have been

eligible for "interim supplement" benefits until he reached the age of 62 years and 1

month. (*See id.; see also id.* at 74, Brochure at 27 (describing GM Plan benefits for

former GM employees who, like Plaintiff, transferred to EDS after September 1, 1985,

and explaining that "[t]he interim supplement will not be payable if you retire after age 55

and before age 60 when your years of age and GM credited service total less than 85").)

Dissatisfied with this explanation, Plaintiff filed an administrative claim with the

Plan administrator on December 30, 2009, contending that his decision to begin collecting

benefits under the GM Plan was based on representations (i) that he had attained the

requisite 85 points to qualify for "interim supplement" benefits, and (ii) that, as a result,

he would receive monthly payments of $2,568.18, rather than the $1,347.41 payments

actually issued to him under the Plan. (*See id.* at 42-43, 12/30/2009 Employee Claim.)

After this claim and subsequent administrative appeals proved unsuccessful, Plaintiff

commenced the present suit on August 10, 2011, asserting a number of claims under

ERISA and state law in an effort to recover the additional pension benefits allegedly

owed to him under the GM Plan.

### III.  <u>ANALYSIS</u>

A.  **The Standards Governing the Parties' Cross-Motions**

1.  **Plaintiff's Claim for Benefits Under the GM Plan**

10

In Count I of his second amended complaint, Plaintiff challenges the denial of his claim for additional pension benefits under the GM Plan. This claim has been brought under § 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)B), which authorizes a participant in or beneficiary of an employee benefit plan governed by ERISA to bring suit in federal district court to recover benefits due under the terms of the plan. Courts review *de novo* a denial of benefits challenged under this provision, unless the benefit plan confers upon the administrator the discretionary authority to determine eligibility for benefits or to construe the terms of the plan, in which case a more deferential "arbitrary and capricious" standard applies. *See Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S. Ct. 948, 956-57 (1989); *Yeager v. Reliance Standard Life Ins. Co.,* 88 F.3d 376, 380 (6th Cir. 1996).

In this case, Defendants contend that the "arbitrary and capricious" standard governs the Court's review of Plaintiff's claim for benefits, in light of the language in the GM Plan that (i) grants GM as plan administrator the "full authority to construe, interpret and administer" the Plan, (ii) confers upon the Employee Benefit Plans Committee ("EBPC") the "delegated discretionary authority to construe, interpret, and administer" the Plan, and (iii) provides that "[t]he decision of the EBPC [on administrative appeal] shall be final and binding upon [GM] and the participant or beneficiary." (Admin. Record at 351, Plan at 210.) As Defendants observe, the Sixth Circuit has recognized that plan language of this sort, granting the authority to construe the terms of the plan and providing that the plan administrator's benefit determinations shall be binding and

11

conclusive, triggers judicial review under the deferential "arbitrary and capricious" standard. *See Calvert v. Firstar Finance, Inc.,* 409 F.3d 286, 292 (6th Cir. 2005).

Although Plaintiff seemingly suggests that *de novo* review should apply here, his rather muddled and confusing argument on this point apparently rests solely on the purported existence of a conflict of interest. In particular, Plaintiff asserts — albeit without citation to any support in the record — that his employer, GM, both "funds the plan and evaluates the claims," (Plaintiff's Motion, Br. in Support at 10), thereby giving rise to a purported incentive to reduce the awards of pension benefits paid to retirees. Yet, even assuming this is so, this conflict of interest would not mandate *de novo* review of GM's benefit decision, but instead would require that the Court take this purported conflict "into account as a factor in determining whether [GM's] decision was arbitrary and capricious." *Calvert,* 409 F.3d at 292 (internal quotation marks and citations omitted).

As this Court has previously observed, the "arbitrary and capricious" standard is the "least demanding form of judicial review," under which this Court must uphold a denial of benefits if it is "rational in light of the plan's provisions." *Monks v. Keystone Powdered Metal Co.,* 78 F. Supp.2d 647, 657 (E.D. Mich. 2000) (internal quotation marks and citations omitted), *aff'd,* 2001 WL 493367 (6th Cir. May 3, 2001). "When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Davis v. Kentucky Finance Cos. Retirement Plan*, 887 F.2d 689, 693 (6th Cir. 1989) (internal quotations and citations omitted).

"Before concluding that a decision was arbitrary and capricious, a court must be confident that the decisionmaker overlooked something important or seriously erred in appreciating the significance of evidence." *Marchetti v. Sun Life Assurance Co.,* 30 F. Supp.2d 1001, 1008 (M.D. Tenn. 1998).

Finally, in reviewing GM's decision to deny the benefits sought by Plaintiff, the Court is "confined to the record that was before the Plan Administrator," and "may not admit or consider any evidence not presented to the administrator." *Wilkins,* 150 F.3d at 615, 619.  The pertinent record, however, is not limited solely to the evidence before the administrator at the time of its initial decision, but also includes materials considered during the administrative appeals process.  *See Miller v. Metropolitan Life Ins. Co.,* 925 F.2d 979, 986 (6th Cir. 1991).

### 2.    Plaintiff's Claims of Breach of Fiduciary Duty and Equitable Estoppel

Apart from this claim for benefits under the GM Plan, Plaintiff is pursuing two other theories of recovery arising under federal law.  First, in Count II of his second amended complaint, Plaintiff alleges that Defendants breached duties owed to him in their roles as fiduciaries with respect to the GM Plan,[7] and that these alleged breaches of fiduciary duties give rise to a claim under § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), which authorizes a plan participant or beneficiary to bring an action to "enjoin any act or

---

[7]Plaintiff does not indicate in his complaint which of the several Defendants should qualify as fiduciaries under ERISA, and Defendants question in their present motion whether Defendant Fidelity, in particular, is properly characterized as a Plan fiduciary in light of its purported "ministerial recordkeeping" role, (*see* Defendants' Motion, Br. in Support at 13).  The Court returns to this issue below.

practice which violates any provision of" ERISA or to "obtain other appropriate equitable relief . . . to redress such violations."  Next, in Count V of his second amended complaint, Plaintiff asserts a claim of equitable estoppel, alleging that Defendants made misrepresentations of material facts that led him to take actions contrary to his best interests in electing to accept EDS's offer of early retirement and to begin collecting pension benefits under the GM Plan.  While Plaintiff's complaint fails to indicate whether this claim of equitable estoppel arises under state or federal law, it is evident from his briefing on the parties' cross-motions that this claim rests upon federal common law derived from ERISA.  *See Bloemker v. Laborers' Local 265 Pension Fund,* 605 F.3d 436, 440 (6th Cir. 2010) (recognizing the existence of a federal common law claim of equitable estoppel in the context of ERISA pension benefits).[8]

Through these claims — in contrast to the denial-of-benefits claim asserted in Count I — Plaintiff does not seek to challenge a decision of the Plan administrator to award pension benefits in an amount less than what he believes is owed to him under the terms of the Plan.  Rather, these claims rest upon legal obligations allegedly imposed by ERISA and amounts of benefits purportedly owed without regard to what the terms of the

---

[8]As the Sixth Circuit has observed, it is not clear whether such an ERISA-based claim of equitable estoppel is more properly characterized as "one sounding in § 1132(a)(1)(B) for plan benefits," or instead as seeking extracontractual, equitable relief under § 1132(a)(3).  *Julia v. Bridgestone/Firestone, Inc.,* No. 02-4376, 101 F. App'x 27, 30-31 (6th Cir. May 27, 2004).  The Sixth Circuit has twice deemed it unnecessary to "wade too deeply into this morass," *Julia,* 101 F. App'x at 31; *Gore v. El Paso Energy Corp. Long Term Disability Plan,* 477 F.3d 833, 841-42 (6th Cir. 2007), and this Court likewise need not resolve this question here, in light of the grounds upon which it resolves Plaintiff's claim of equitable estoppel.

Plan might require.  Accordingly, because there is no determination of the Plan administrator to review in resolving these claims — and, thus, no deference owed to any such administrative decision — the courts have found that the *Wilkins* standard does not apply, and that such claims instead should be addressed under ordinary summary judgment principles.  *See Moore v. Lafayette Life Insurance Co.,* 458 F.3d 416, 427 (6th Cir. 2006); *see also Mello v. Sara Lee Corp.,* 431 F.3d 440, 443-44 (5th Cir. 2005). Likewise, because the Court is not reviewing a Plan administrator's decision, the rule in *Wilkins* that such review must be limited to the administrative record is not applicable, and the Court may properly consider the additional materials produced by Plaintiff in resolving his breach of fiduciary duty and equitable estoppel claims.[9]

With respect to these claims, then, the parties' arguments in their cross-motions must be evaluated under the standards of Fed. R. Civ. P. 56(a), which provides that summary judgment is proper "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  As the Supreme Court has explained, "the plain language of Rule 56[] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v.*

---

[9]Accordingly, to the extent that Defendants broadly move to strike these additional materials from the record that the Court may properly consider in resolving the parties' cross-motions, this request is denied.

15

*Catrett,* 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).  To the extent that a moving

party — here, Plaintiff — seeks an award of summary judgment in his favor on a claim or

issue as to which he bears the burden of proof at trial, this party's "showing must be

sufficient for the court to hold that no reasonable trier of fact could find other than for the

moving party." *Calderone v. United States,* 799 F.2d 254, 259 (6th Cir. 1986) (internal

quotation marks, citation, and emphasis omitted).

 In deciding a motion brought under Rule 56, the Court must view the evidence in a

light most favorable to the nonmoving party.  *Pack v. Damon Corp.,* 434 F.3d 810, 813

(6th Cir. 2006).  Yet, the nonmoving party may not rely on bare allegations or denials, but

instead must support a claim of disputed facts by "citing to particular parts of materials in

the record, including depositions, documents, electronically stored information, affidavits

or declarations, stipulations . . . , admissions, interrogatory answers, or other materials."

Fed. R. Civ. P. 56(c)(1)(A).  Moreover, any supporting or opposing affidavits "must be

made on personal knowledge, set out facts that would be admissible in evidence, and

show that the affiant or declarant is competent to testify on the matters stated."  Fed. R.

Civ. P. 56(c)(4).  Finally, "the mere existence of a scintilla of evidence that supports the

nonmoving party's claims is insufficient to defeat summary judgment." *Pack,* 434 F.3d at

814 (alteration, internal quotation marks, and citation omitted).

**B.** **The Defendant Plan Administrator's Decision That Plaintiff Was Not Entitled to Interim Supplement Benefits Under the GM Plan Was Not Arbitrary and Capricious.**

 With the above standards in mind, the Court now turns to Count I of Plaintiff's

16

complaint, in which he challenges the determinations of the Plan administrator, GM, and the EBPC that he was not entitled to the "interim supplement" benefits that the Plan makes available to some participants until they reach the age of 62 years and 1 month.  As Defendants explain in their cross-motion, this claim is readily resolved in Defendants' favor as a matter of law, as Plaintiff essentially concedes that the terms of the GM Plan were reasonably construed and correctly applied in denying his request for interim supplement benefits.

Plaintiff's entitlement to interim supplement benefits is governed by provisions in the GM Plan that apply particularly to employees who, like Plaintiff, were formerly employed by GM and then went to work for EDS.  A brochure issued to these employees describes the categories of retirement benefits available to these individuals under the GM Plan, and a paragraph in section VI.A.3 of this brochure more specifically addresses employees who — again like Plaintiff — retire from EDS after the age of 55 but prior to the age of 62 and whose employment with GM and EDS together totals over 30 years:

> If you have 30 or more years of combined GM-EDS credited service, or your age plus combined GM-EDS credited service equals 85 or more, upon your retirement from EDS, you will be entitled to Part A basic and Part B primary and supplementary benefits, as described in Section VI.A.1. However, all of these benefits would be reduced if you retire from EDS before age 62.  Your Part A basic benefit will be re-determined after age 62, without reduction for age.  Part B benefits will not be restored after such retirement.  You also may be eligible for a monthly Part A supplement (see Section VI.A.5.).

(Admin. Record at 73, Brochure ("Your Benefits Under the GM Salaried Benefit Programs in Connection with the Split-Off of EDS") at 26.)  The above-referenced

17

section VI.A.5 of this brochure then describes the specific "interim supplement" benefits at issue here:

> If you retire voluntarily from GM with less than 30 years of GM credited service, you may be eligible for a Part A interim supplement in an amount based on your age at retirement. This supplement currently ranges from $14.55 to $31.45 per month per year of GM credited service, depending on your age when benefits commence and the date you retire. The interim supplement is payable until you reach age 62 and one month. The interim supplement will not be payable if you retire after age 55 and before age 60 when your years of age and GM credited service total less than 85.

(*Id.* at 74, Brochure at 27.)

When Plaintiff concluded his employment at GM in 1992 and went to work for EDS, he had accrued 25 year and 9 months of GM credited service. Combined with his several years of additional employment at EDS, Plaintiff easily exceeded the 30-year threshold under section VI.A.3 of the brochure for "Part A basic and Part B primary and supplementary benefits." Yet, because he had less than 30 years of GM credited service, and because he retired from EDS before reaching the age of 60, he was eligible for interim supplement benefits under section VI.A.5 only if his years of age plus his GM credited service totaled at least 85. In denying Plaintiff's claim for these interim supplement benefits, GM determined that Plaintiff had not attained the requisite 85 points, explaining that Plaintiff's years of GM credited service (25.75) plus his age on his EDS retirement date of December 1, 2007 (59.04) totaled only 84.79. (*See* Admin. Record at 100-02, Plan Administrator 7/12/2010 Denial Letter; *see also id.* at 2-3, 1/5/2011 EBPC Denial Letter.)

18

Throughout his voluminous briefing on the parties' cross-motions, Plaintiff does not contest the factual basis for this determination that he lacked the necessary 85 points to qualify for interim supplement benefits under the GM Plan. To the contrary, Plaintiff acknowledges in his motion that "[a]s it turns out he did not have the 85 points for the higher benefit." (Plaintiff's Motion at ¶ 1.)[10]  Neither does Plaintiff assert that the GM Plan is susceptible to an interpretation under which he would be eligible for interim supplement benefits. Indeed, as Defendants correctly observe, Plaintiff "does not cite to one [Plan] provision in his entire motion and brief," (Defendants' Response Br. at 9), much less endeavor to explain how any such provision could be construed as establishing his eligibility for interim supplement benefits. Finally, Plaintiff does not contend that any purported assurances he was given regarding his eligibility for interim supplement benefits operated to amend the pertinent terms of the GM Plan governing these benefits, and the case law would defeat this contention in any event. *See, e.g., Bloemker,* 605 F.3d at 444 (holding that a mistaken benefit calculation given to the plaintiff plan participant "did not purport to be an amendment or a modification to the Plan," and thus could not support an ERISA claim for benefits); *Crosby v. Rohm & Haas Co.,* 480 F.3d 423, 429 (6th Cir. 2007) (holding that a worksheet that estimated the life insurance benefits available to an employee "was nothing more than an informal communication between

---

[10]To be sure, Plaintiff attributes his failure to meet this 85-point threshold to Defendants' "misrepresentations and silence," (*id.*), but this does not call into question the factual basis for the Plan administrator's decision. Rather, these allegations of misrepresentations and omissions bear upon Plaintiff's other federal claims of breach of fiduciary duty and equitable estoppel, as addressed below.

the administrator and one employee," and therefore "could not amend the terms of the plan"). Against this backdrop, the Court readily concludes that the decision of the Defendant administrator of the GM Plan to deny Plaintiff's claim for interim supplement benefits was not arbitrary or capricious.

**C.    Defendant Fidelity Did Not Act as a Plan Fiduciary in Its Communications with Plaintiff Regarding His Early Retirement Benefits, and the Defendant Plan Administrator Cannot Be Held Liable Under a Breach of Fiduciary Duty Theory for the Alleged Misstatements Made by Fidelity.**

Next, in Count II of his second amended complaint, Plaintiff has asserted a breach of fiduciary duty claim against "the Defendants" generally, (Second Amended Complaint at ¶ 45), alleging that they failed to properly discharge the duties imposed upon plan fiduciaries under § 404(a) of ERISA, 29 U.S.C. § 1104(a). In their present motion, Defendants challenge this claim on several grounds, arguing (i) that Plaintiff's breach of fiduciary duty claim is subject to dismissal as an impermissible "repackaging" of his claim for Plan benefits, (ii) that Defendant Fidelity was not serving as a fiduciary of the GM Plan in its communications with Plaintiff regarding his early retirement benefits, and (iii) that a breach of fiduciary duty claim against Defendant GM cannot be based upon Defendant Fidelity's alleged misrepresentations to Plaintiff concerning his eligibility for interim supplement benefits under the Plan. The Court cannot accept the first of these contentions, but agrees that Plaintiff's breach of fiduciary duty claim is defeated on the remaining two grounds identified by Defendants.

As Defendants correctly observe, the Sixth Circuit has shown a reluctance to

20

permit a plan participant to pursue an ERISA breach of fiduciary duty claim when a claim for denial of ERISA benefits would provide a remedy for the plan participant's alleged injury.  *See, e.g., Marks v. Newcourt Credit Group, Inc.,* 342 F.3d 444, 454 (6th Cir. 2003); *Wilkins,* 150 F.3d at 615.  Yet, the Sixth Circuit has more recently "clarified" that "under some circumstances," at least, "an ERISA plaintiff may simultaneously bring claims under both § 1132(a)(1)(B) [for denial of benefits] and § 1132(a)(3) [for breach of fiduciary duty]."  *Gore,* 477 F.3d at 839 (citing *Hill v. Blue Cross & Blue Shield of Michigan,* 409 F.3d 710, 718 (6th Cir. 2005)).  As explained in *Gore,* 477 F.3d at 840-41, a breach of fiduciary duty claim is not properly deemed a mere "repackaging" of a denial of benefits claim if the plaintiff is able to identify "separate and distinct injuries" flowing from these two alleged ERISA violations.

While it cannot be said that Plaintiff and his counsel have provided much assistance in the Court's inquiry on this point, the Court finds that Plaintiff's breach of fiduciary claim here is more akin to the one asserted in *Gore* than the breach of fiduciary duty claim rejected in *Wilkins* as merely duplicative of a claim for benefits.  In *Gore,* 477 F.3d at 840-41, as here, the plaintiff plan participant claimed an entitlement to benefits under the defendant plan, but also alleged in the alternative that the defendant plan administrator breached its fiduciary duty by "leading [him] to believe" that he would receive an additional year of disability benefits under the plan.  Although an award of benefits under the first of these theories would have made the plaintiff whole and rendered his remaining claim moot, the court rejected the notion that this meant that the

21

breach of fiduciary duty claim was merely "a repackaged denial of benefits claim." 477 F.3d at 841. Instead, the Sixth Circuit reasoned that the claims were distinct because the resolution of the plaintiff's claim for benefits did not require the court to determine the separate question "whether [the plaintiff] was entitled to another year of . . . benefits" arising from the plan administrator's alleged misrepresentation that these additional benefits would be forthcoming. 477 F.3d at 841. Although this Court acknowledges that the distinction drawn in *Gore* concerning "separate and distinct injuries" may not always be clear — and, in particular, does not seem to be especially clear as applied to the facts presented here, where Plaintiff's claim for benefits and breach of fiduciary duty claim implicate the very same interim supplement benefits — the Court nonetheless reads *Gore* as defeating Defendants' contention that Plaintiff's breach of fiduciary duty claim is an impermissible "repackaging" of his claim for benefits.

Defendants fare better, however, in their argument that Defendant Fidelity did not act as a fiduciary with respect to the GM Plan when it communicated with Plaintiff regarding the types and amounts of early retirement benefits he was entitled to receive under the Plan. "The threshold question in all cases charging breach of ERISA fiduciary duty is whether the defendant was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint." *Cataldo v. U.S. Steel Corp.,* 676 F.3d 542, 552 (6th Cir. 2012 ) (internal quotation marks and citation omitted). The Sixth Circuit has held that a person or business entity that "perform[s] only ministerial functions with respect to" an ERISA plan and does not have "discretionary

22

control over the management of plan assets or the administration of the plan" does not

qualify as an ERISA fiduciary. *Flacche v. Sun Life Assurance Co.,* 958 F.2d 730, 734

(6th Cir. 1992). As examples of "purely ministerial functions" that do not give rise to

fiduciary status, the Sixth Circuit has cited such activities as "processing claims, applying

plan eligibility rules, communicating with employees, and calculating benefits." *Baxter v.

C.A. Muer Corp.,* 941 F.2d 451, 455 (6th Cir. 1991).

In a number of cases — including binding Sixth Circuit decisions — the courts

have concluded that firms (like Defendant Fidelity here) that merely communicate with

plan participants regarding plan benefits and calculate or estimate plan benefits at the

request of individual participants do not act as ERISA fiduciaries. In *Flacche,* 958 F.2d

at 732, for example, defendant Sun Life issued a "Summary of Benefits Certificate" to the

plaintiff plan participant reflecting that he was entitled to $4,846 in monthly early

retirement benefits, and Sun Life then informed the plaintiff one month later that this

monthly benefit had been recalculated and reduced to $4,429.94. The plaintiff received

these benefits for over a year, and he alleged that he relied on this benefit amount in

deciding to retire from a new position he had taken after the early retirement giving rise to

these benefits. Sun Life subsequently reduced the plaintiff's monthly benefits to

$3,312.74, however, upon determining that it had miscalculated the base pension benefits

to which the plaintiff was entitled under his former employer's retirement plan.

The Sixth Circuit affirmed the district court's determination that Sun Life had

performed only "ministerial functions" that did not give rise to fiduciary liability under

23

ERISA. *Flacche,* 958 F.2d at 734. In so ruling, the court first noted that Sun Life was not identified as a fiduciary in the plan itself. 958 F.2d at 734. The court then found that Sun Life's "mere payment of claims is insufficient to give Sun Life discretionary control over the management of plan assets or the administration of the plan," as necessary to confer fiduciary status under ERISA. 958 F.2d at 734. Finally, the court rejected the plaintiff's argument, based upon Ohio common law, that Sun Life stepped into the role of fiduciary once it undertook to compute and pay benefits to the plaintiff, thereby giving rise to a duty "to act primarily for the benefit" of plaintiff in performing this task. 958 F.2d at 735. The court reasoned that it would not be appropriate for the courts to "develop common-law alternative definitions for terms that are clearly defined" within ERISA itself. 958 F.2d at 735.

Beyond this ruling in *Flacche,* Defendants have pointed to a number of other decisions that are even more factually on point here — that is, cases in which the plaintiff sought to confer fiduciary status based on (i) his or her communication with the defendant regarding plan benefits or (ii) the defendant's furnishing of an estimate of plan benefits that later proved incorrect. In *Bloemker,* 605 F.3d at 439, for instance, the plaintiff employee contacted a representative of defendant Stoner & Associates, the third-party administrator of the employee's retirement plan, to "discuss the possibility of early retirement," and he received a letter and benefit election form from Stoner estimating that his retirement benefits would be between $2,339.47 and $2,564.00 per month. The plaintiff elected early retirement and received monthly benefits of $2,339.49 for nearly

24

two years, but he then received a letter from Stoner stating that his benefits had been incorrectly calculated due to a "computer programming error," and that the correct monthly benefit amount was $1,829.71. 605 F.3d at 439.[11] The district court held that Stoner did not act as an ERISA fiduciary in calculating the plaintiff's retirement benefits and communicating with him regarding the amount of these benefits, and the Sixth Circuit affirmed this ruling, explaining that its decision in *Flacche* was "controlling" on this issue. 605 F.3d at 440, 444; *see also Cataldo,* 676 F.3d at 552 (rejecting the plaintiffs' contention that the defendant union could be deemed an ERISA fiduciary under the "theory that [the union] explained plan benefits and business decisions regarding plan benefits to plaintiffs and made assurances to those considering retirement"); *Schmidt v. Sheet Metal Workers' National Pension Fund,* 128 F.3d 541, 547 (7th Cir. 1997) (holding that a benefit analyst who sent the incorrect form in response to a request regarding the procedure for designating a beneficiary "was not an ERISA fiduciary, as [the analyst] merely performed ministerial and clerical functions relating to the administration of the Plan" and "had no discretionary authority or control in the tasks she was assigned").

In accordance with this uniform weight of authority, the Court readily concludes that Defendant Fidelity did not act as an ERISA fiduciary when its representatives communicated over the telephone with Plaintiff regarding his early retirement benefits

---

[11]In *Bloemker,* 605 F.3d at 439, the plaintiff's monthly benefit payments were not only reduced to reflect this corrected calculation, but he was informed "that he was required to repay the $11,215.16 that he was overpaid."

under the GM Plan, nor when it issued written estimates of these benefits to Plaintiff.  As in the above-cited cases, Defendant Fidelity performed purely ministerial tasks in responding to Plaintiff's inquiries regarding his benefits under the GM Plan.  In carrying out these functions, Fidelity did not exercise "discretionary control over the management of plan assets or the administration of the plan," *Flacche,* 958 F.2d at 734, and Plaintiff has not pointed to any evidence that might suggest a contrary conclusion.  Moreover, Plaintiff has failed to cite any Plan language — nor has the Court's review of the Plan uncovered any — that identifies Fidelity as a fiduciary or grants it any discretionary role in the administration of the Plan.  It follows that Defendant Fidelity cannot be held liable under the breach of fiduciary duty theory advanced in Count II of Plaintiff's complaint.

Next, while Defendant GM does qualify as an ERISA fiduciary, in light of its designation as Plan administrator and the Plan language conferring upon it the discretionary authority to administer the Plan, Plaintiff has failed to put forward any evidentiary support for its breach of fiduciary duty claim against this Defendant.  Although Plaintiff has not been altogether clear, whether in his briefs in support of his motion or in his underlying complaint, as to the ways in which Defendant GM might have breached its fiduciary duty, he has not cited any evidence that he communicated directly with any GM employee regarding his early retirement benefits under the GM Plan, nor that he received any written correspondence directly from GM that misrepresented his benefits under the Plan.  Rather, Plaintiff's breach of fiduciary duty claim against Defendant GM apparently rests on the theory that GM, as plan administrator, is

26

responsible for the misrepresentations allegedly made to Plaintiff by its agent, Fidelity. (*See* Plaintiff's Motion, Br. in Support at 17-19.)

Yet, the cases cited by Plaintiff in support of this theory of principal liability for an agent's breach of a fiduciary duty are either distinguishable or wholly inapposite. First, and most promisingly, Plaintiff points to *Richards v. General Motors Corp.,* 991 F.2d 1227, 1232 (6th Cir. 1993), in which the Sixth Circuit found that the plaintiff employee could pursue a breach of fiduciary duty claim against his employer arising from representations made to him by an individual designated by the employer as the "local Plan Administrator" for the plant where the plaintiff worked. *Richards,* however, is distinguishable on at least two grounds. First, the agent in *Richards* was expressly appointed by the employer "to administer the [ERISA] plan" on its behalf at one of its plants, and the defendant employer then proceeded to accept and ratify the transactions carried out "under the direct instruction" of this local administrator for three years. *Richards,* 991 F.2d at 1232. Here, in contrast, there is no comparable evidence that Defendant GM appointed Fidelity to perform plan administration duties on its behalf, or that it otherwise delegated such duties to Fidelity or ratified any administrative functions carried out by this firm.

Next, the plaintiff's allegations in *Richards* indicated that the local plan administrator had, in fact, been called upon to perform fiduciary tasks in her interactions with plant employees, such as "explain[ing] and interpret[ing]" the terms of the plan and instructing employees how to carry out plan transactions. 991 F.2d at 1232; *see also*

27

*Varity Corp. v. Howe,* 516 U.S. 489, 503, 116 S. Ct. 1065, 1073 (1996) (finding that a corporate employer's liability for breach of fiduciary duty could rest upon letters and other documents that "came from those within the firm who had authority to communicate as fiduciaries with plan beneficiaries," and who used this authority to "answer[] beneficiaries' questions about the meaning of the terms of a plan" and to "offer beneficiaries detailed plan information in order to help them decide whether to remain with the plan").  As discussed above, Fidelity's interactions with Plaintiff in this case did not entail the exercise of any such fiduciary authority, but instead involved functions that the courts have deemed to be wholly ministerial, such as fielding benefit inquiries from employees and applying the terms of the GM Plan to calculate estimated benefits at an employee's request.  Accordingly, *Richards* fails to provide a basis for an agency theory of breach of fiduciary duty liability under the record presented here.

The two remaining cases cited by Plaintiff in support of this theory warrant little (if any) discussion.  In the first, *Paneccasio v. Unisource Worldwide, Inc.,* 532 F.3d 101, 108 (2d Cir. 2008), the Second Circuit summarily affirmed the district court's dismissal of the plaintiff's breach of fiduciary duty claim, without any discussion of the merits of this claim or the possible contours of a viable breach of fiduciary duty claim.  More importantly, the Court has searched this decision in vain for ***any discussion*** of the "apparent authority" principle that Plaintiff seeks to draw from it.[12]  The other case cited

---

[12]The Court would no doubt be better able to identify relevant or helpful language in the cases cited by Plaintiff if he and his counsel would direct the Court to ***particular passages*** within

by Plaintiff, *Pell v. E.I. DuPont de Nemours & Co.,* 539 F.3d 292, 301 (3d Cir. 2008),

addresses the concept of "apparent authority" only within the context of an ERISA claim

of equitable estoppel,[13] and does not consider whether or how this same principle might

apply to a breach of fiduciary duty claim.

Defendants, in contrast, have again identified cases that have rejected breach of

fiduciary duty claims under facts similar to those presented here.  Most notably, in

*Schmidt,* 128 F.3d at 544, 546-48, the plaintiff sought to pursue a breach of fiduciary duty

claim against the trustees of a pension fund, based upon a misrepresentation by a benefit

analyst, Eunjae Lee, regarding the proper form for designating a beneficiary of a pension

death benefit.  After first observing that Lee "was not an ERISA fiduciary, as she merely

performed ministerial and clerical functions," the court then found that Lee's erroneous

advice to the plaintiff did not give rise to a breach of fiduciary duty claim against the plan

trustees:

> . . . [T]he Trustees did not make the misstatement on which [the
> plaintiff's] fiduciary claim is based — Lee did.  Significantly, no evidence
> suggests that the Trustees either authorized, participated in, or had
> knowledge of Lee's misstatement, or that the Trustees deliberately withheld
> information from Lee about the proper means of making a beneficiary
> designation.  Rather, this is a case in which the Trustees provided complete
> and correct information to participants both in the Plan itself and in the Plan
> Booklet only to have a ministerial employee make a negligent

---

these decisions.  Yet, Plaintiff and his counsel frequently provide only general case citations,
leaving the Court to its own devices in searching for pertinent discussions or holdings within
these decisions.

[13]As noted, Plaintiff has asserted a claim of equitable estoppel here, and this claim will be
addressed below.

misrepresentation in response to a single question from a single participant.
The district court concluded that absent evidence that the Trustees had
participated in Lee's misstatement or had failed to exercise care in hiring
her, the Trustees could not be said to have breached their fiduciary duties
solely by virtue of Lee's misstatement.  We believe that in general, the
district court was correct, but we would add that the Trustees may also
breach their fiduciary duties by failing to exercise care in training someone
like Lee, or by retaining her in circumstances where they should know her
performance to be inadequate.  There is no evidence that the Trustees in this
case were involved in any way with Lee's misstatement.  Nor has [the
plaintiff] attempted to show that the Trustees failed to exercise due care
either in hiring or retaining Lee, or in training her to respond to inquiries
from plan participants.  We therefore agree with the district court that Lee's
misstatement would not in these circumstances support a breach of
fiduciary duty claim against the Trustees.

*Schmidt,* 128 F.3d at 547-48 (citations omitted); *see also Easa v. Florists' Transworld*

*Delivery Ass'n,* 5 F. Supp.2d 522, 529 (E.D. Mich. 1998) (holding that the defendant

employer and plan administrator could not be held liable under a breach of fiduciary duty

theory for inaccurate information conveyed by one of its employees "functioning in a

ministerial capacity," where there was "no evidence to suggest that anyone, acting in a

fiduciary capacity, . . . either authorized, participated in, or had knowledge of" the

dissemination of mistaken benefit information to the plaintiff).

Schmidt and *Easa* are squarely on point here.  As in those cases, the record here

fails to provide any basis for concluding that Defendant GM authorized, participated in,

had knowledge of, or ratified Defendant Fidelity's allegedly inaccurate or misleading

communications with Plaintiff regarding the amount of his early retirement benefits and

his eligibility for the "interim supplement" component of these benefits.  Nor has Plaintiff

produced evidence that GM failed to exercise due care in retaining Fidelity to operate the

30

GM Benefits and Service Center that employees were directed to contact with benefit inquiries, or in supervising or training the Fidelity representatives who handled these inquiries.  Finally, as in *Schmidt* and *Easa,* the record here indicates that the pertinent GM Plan documents — as well as an accompanying benefit brochure specific to employees like Plaintiff who had transferred from GM to EDS — were available for Plaintiff's inspection and review, and that these materials would have correctly apprised Plaintiff about the 85-point level he had to achieve in order to receive interim supplement payments as part of his overall early retirement benefits.  Accordingly, the Court concludes as a matter of law that Plaintiff's breach of fiduciary duty claim against Defendant GM fails for lack of evidentiary support.[14]

**D.    Plaintiff Has Failed as a Matter of Law To Establish Several of the Elements of His ERISA Claim of Equitable Estoppel.**

Plaintiff's third and final ERISA-based theory of recovery rests upon principles of equitable estoppel.  As explained by the Sixth Circuit, the doctrine of equitable estoppel operates to "preclude[] a party from exercising contractual rights because of his own inequitable conduct toward the party asserting the estoppel."  *Armistead v. Vernitron*

---

[14]As noted earlier, three separate GM entities have been named as defendants in Plaintiff's second amended complaint — General Motors Corporation, Motors Liquidation Company, and General Motors LLC — and only the last of these three GM defendants is a party to Defendants' present motion.  As one of their challenges to Plaintiff's breach of fiduciary duty claim, the moving Defendants note that General Motors LLC did not become a Plan fiduciary until this company was formed in 2009, and they argue that this newly-formed entity cannot be held liable for the alleged breaches complained of by Plaintiff, all of which occurred in late 2007 or early 2008.  The Court need not address this contention, in light of its resolution of Plaintiff's breach of fiduciary duty claim on grounds that are equally applicable to each of the three GM defendants.

*Corp.,* 944 F.2d 1287, 1299 (6th Cir. 1991). While this theory appears to provide the best "fit" with Plaintiff's allegations in this case, the Court nonetheless agrees with Defendants that the record here falls short of establishing several of the required elements of an ERISA-based claim of equitable estoppel.

In its earlier cases addressing this theory of recovery, the Sixth Circuit permitted the application of equitable estoppel only in the context of ERISA welfare benefit plans, while declining to decide whether this theory should also be available where, as here, a plaintiff seeks benefits from a pension fund. *See Sprague v. General Motors Corp.,* 133 F.3d 388, 403 (6th Cir. 1998); *Armistead,* 944 F.2d at 1300. As explained in *Armistead,* 944 F.2d at 1300, the basis for this distinction is that "pension benefits are typically paid out of funds to which both employers and employee[s] contribute," with "[c]ontributions and pay-outs . . . determined by actuarial assumptions reflected in the terms of the plan." Thus, "[i]f the effective terms of the plan may be altered" through the operation of equitable estoppel arising from "transactions between officers of the plan and individual plan participants or discrete groups of them, the rights and legitimate expectations of third parties to retirement income may be prejudiced." *Armistead,* 944 F.2d at 1300.

In its more recent decision in *Bloemker, supra,* 605 F.3d at 440, however, the Sixth Circuit found that a claim of equitable estoppel could go forward in a case involving an ERISA pension plan. In so ruling, the court noted that it was "[f]ollowing a number of other circuits" in allowing this theory of recovery. *Bloemker,* 605 F.3d at 440. Yet, to address the concern raised in *Armistead* that "estoppel claims could undermine the

32

financial integrity of ERISA pension plans," the court emphasized that it would permit such a claim in pension cases only where (i) the representation giving rise to the claim of estoppel "was made in writing," and (ii) "the plaintiff can demonstrate extraordinary circumstances." 605 F.3d at 440. Beyond these showings, a plaintiff must also establish the five elements of a traditional claim of equitable estoppel:

> 1) conduct or language amounting to a representation of material fact; 2) awareness of the true facts by the party to be estopped; 3) an intention on the part of the party to be estopped that the representation be acted on, or conduct toward the party asserting the estoppel such that the latter has a right to believe that the former's conduct is so intended; 4) unawareness of the true facts by the party asserting the estoppel; and 5) detrimental and justifiable reliance by the party asserting estoppel on the representation.

*Bloemker,* 605 F.3d at 442 (citing *Armistead,* 944 F.2d at 1298).

In this case, Defendants argue (and the Court agrees) that Plaintiff has failed at the threshold to identify a misrepresentation "made in writing" that would satisfy the Sixth Circuit's standard for invoking equitable estoppel in a pension case. Plaintiff's appeal to equitable estoppel rests upon his telephone communications with representatives of Defendant Fidelity in the fall of 2007, as he contemplated whether to accept EDS's offer of early retirement by an October 30, 2007 deadline. Yet, Plaintiff concedes that as this deadline approached, and as he ultimately elected in late October of 2007 to accept this early retirement offer, he received ***no*** written statements or assurances from Fidelity concerning his benefits under the GM Plan that played a role in this decision. To the contrary, he expresses considerable (and understandable) frustration that despite his repeated statements in phone calls to Fidelity representatives during this period that time

33

was of the essence, and that he needed to obtain a prompt estimate of his benefits under

the GM Plan "in order to properly make his decision whether to retire from EDS by

October 30, 2007," the promises by Fidelity representatives to "provid[e] the needed GM

pension information . . . were never fulfilled" prior to this October 30, 2007 deadline.

(Plaintiff's Motion, Br. in Support at 3.)  Thus, to the extent that Plaintiff's claim of

equitable estoppel rests upon the theory that he accepted EDS's early retirement offer in

reliance on assurances made to him (or material facts withheld from him) by Fidelity

representatives in the days leading up to this acceptance, the record from this period lacks

any written representation made by Defendant Fidelity (or any other Defendant) that

would satisfy the standard adopted by the Sixth Circuit in *Bloemker*.[15]

---

[15]It is worth noting, in apparent contrast to the above-quoted assertion in Plaintiff's brief, that the additional administrative record produced by Plaintiff indicates that Fidelity representatives evidently sent him *two* written estimates of his GM Plan benefits prior to the October 30, 2007 deadline for deciding whether to accept EDS's early retirement offer.  Yet, Plaintiff does not contend (and cannot contend) that either of these estimates would support his claim of equitable estoppel.  In the first, dated September 20, 2007, Plaintiff's monthly benefit is estimated as $1,383.79 — roughly the same as the $1,347.41 monthly amount Plaintiff was paid when he first began to receive Plan benefits in the summer of 2008 — and this estimate *does not include* interim supplement benefits.  (*See* Pl. Record at 3-4.)  While two pages of this September 20, 2007 correspondence have been omitted from the record, it appears that this estimate reflects a benefit commencement date of October 1, 2007, (*see id.* at 5), which turned out to be inaccurate and premature in light of Plaintiff's actual EDS retirement date of December 1, 2007 and his election to commence GM Plan benefits in 2008.

Plaintiff also has produced a written estimate dated October 25, 2007.  This estimate *does* include interim supplement benefits payable until January 1, 2011, but it is expressly based on a retirement date of November 30, 2010 and a benefit commencement date of December 1, 2010.  (*See id.* at 14-15.)  All are agreed that if Plaintiff had continued working three more years and retired in 2010, he would have easily accrued the 85 points needed to obtain interim supplement benefits under the GM Plan.  Accordingly, neither of these written estimates issued to Plaintiff prior to October 30, 2007 can be said to have misled Plaintiff into believing that he would be eligible for interim supplement benefits if he accepted EDS's early retirement offer and ceased

In an effort to avoid this result, Plaintiff suggests that the requisite "written representation" can be found in the transcriptions of his telephone conversations with Fidelity representatives in September and October of 2007, prior to his decision to accept EDS's offer of early retirement.  (*See* Plaintiff's Response Br. at 8.)  These calls evidently were recorded, and have been transcribed in the course of this litigation.  As support for the proposition that these transcriptions may serve as "written representations," Plaintiff points to Federal Rule of Evidence 1001(1), which (at the time this suit was filed) defined the terms "writings" and "recordings" as follows:

> "Writings" and "recordings" consist of letters, words, or numbers, or their equivalent, set down by handwriting, typewriting, printing, photostating, photographing, magnetic impulse, mechanical or electronic recording, or other form of data compilation.

Fed. R. Evid. 1001(1) (prior to Dec. 1, 2011 amendment).[16]

This definition in the Federal Rules of Evidence fails in two respects to shed any light on *Bloemker*'s requirement of a "written representation."  First, Rule 1001's definitions are expressly intended only "[f]or purposes of" Article X of the Rules of

_____

working in November of 2007.  Rather, they tend to suggest precisely the opposite.

[16]Effective December 1, 2011, Rule 1001 was amended to establish separate definitions of these two terms.  A "writing" is now defined as "consist[ing] of letters, words, numbers, or their equivalent set down in any form."  Fed. R. Evid. 1001(a).  A "recording," in contrast, "consists of letters, words, numbers, or their equivalent recorded in any manner."  Fed. R. Evid. 1001(b).  Although Plaintiff and his counsel misleadingly quote the earlier version of the Rule as defining only a "writing," (*see* Plaintiff's Response Br. at 8), it is clear that Rule 1001(1), in its prior form, set out a ***compound*** definition that encompassed ***both*** the terms "writings" and "recordings."  The amended Rule eliminates this possible confusion by defining the two terms separately.

Evidence, Fed. R. Evid. 1001, which addresses issues concerning the admissibility of writings, recordings, and photographs (or their duplicates) and the means by which their contents may be proven.  Plaintiff has not cited any authority, and neither is the Court aware of any, that would look to Rule 1001 in determining whether a statement qualifies as a "writing" under some particular substantive body of law.  Next, and more importantly, the former Rule 1001(1), with its compound definition of "writings" and "recordings," elides the very distinction that *Bloemker* intends to make through its requirement of a "written representation."  In mandating that a representation giving rise to an ERISA claim of equitable estoppel must be "made in writing," at least in pension cases, the Sixth Circuit noted the statutory requirement that "ERISA plans must be maintained pursuant to a written instrument," and the court emphasized the "policy concern" that would arise if "the plan's integrity, and possibly its actuarial soundness," could be "eroded" through "oral modifications" resting on the statements of "relatively low-level employees."  *Bloemker,* 605 F.3d at 440-41 (internal quotation marks and citations omitted).  The court explained that this concern "is greatly lessened when the representations at issue are made in writing," as "[t]he formality of the writing requirement . . . lessens the danger . . . that estoppel claims could undermine the financial integrity of ERISA pension plans."  605 F.3d at 441.

The representations on which Plaintiff seeks to rely here trigger precisely the concern addressed in *Bloemker.*  They were made over the phone by ordinary Fidelity call center representatives who, as discussed earlier, had no fiduciary responsibilities or

36

discretionary authority over the interpretation or administration of the GM Plan. The fact that these communications were recorded and later transcribed in the course of this litigation, while perhaps relevant to their admissibility under the Federal Rules of Evidence, does not qualify these quintessentially oral statements as "written," nor does it overcome the absence of any "representation . . . made in writing," *Bloemker,* 605 F.3d at 440, upon which Plaintiff can claim to have relied at the time he considered whether to elect early retirement from EDS and begin drawing benefits from the GM Plan. Accordingly, the Court finds that Plaintiff has failed to identify a written representation that could give rise to an ERISA claim of equitable estoppel in the context of a pension benefit plan.

Beyond this absence of a written representation, the Court agrees with Defendants that Plaintiff has failed to establish several of the elements of a traditional claim of equitable estoppel. First, Plaintiff is not altogether clear in identifying particular statements in the course of his telephone conversations with Fidelity representatives in the fall of 2007 that might qualify as misrepresentations of material facts. Certainly, he has not cited anything in the transcripts of these discussions that would qualify as a direct assurance that he could accept EDS's early retirement offer and still be eligible for interim supplement benefits under the GM Plan. Rather, he instead appears to rely on more ambiguous statements in mid-October of 2007 (i) that his GM Plan benefits would not increase if he continued working for EDS, (*see* Pl. Record at 200-01), and (ii) that there would be "no problem" if he accepted EDS's early retirement offer while

37

postponing his commencement of benefits under the GM Plan to a later date, (*id.* at 212-13).  Yet, the first of these statements apparently was limited to the context of Plaintiff's "base benefit rate" under the GM Plan, (*see id.* at 201), which was determined by his 25.75 years of service at GM and would not increase through additional employment with EDS.  The second statement was entirely correct as far as it went — *i.e.,* that he was not required to begin collecting his benefits under the GM Plan at the same time he retired under EDS's early retirement offer — and, at worst, merely neglected to add that his acceptance of the EDS offer could affect his eligibility for the interim supplement portion of the benefits paid under the GM Plan.

In any event, even accepting that such unclear statements and arguable errors of omission could qualify as material misrepresentations, Plaintiff would next have to produce evidence of the Fidelity representatives' "awareness of the true facts."  *Bloemker,* 605 F.3d at 442.  Throughout the transcripts of Plaintiff's telephone calls prior to his early retirement decision, however, the Fidelity representatives repeatedly advised him that they were awaiting information from EDS, including his termination date, before they could provide a more accurate estimate of his benefits under the GM Plan.  (*See, e.g.,* Pl. Record at 192, 216.)  Indeed, in an October 19, 2007 phone call, Plaintiff was expressly advised that the benefit estimate given to him included "only your basic benefit and your Part B Primary" benefits, and that "[i]f you're entitled to a supplement, it's not calculated in" this estimate.  (*Id.* at 216.)  The Fidelity representative further explained that it was "possible" that Plaintiff would be eligible for such a supplement, but that no

38

determination could be made "until we have the information from EDS," and that the

calculation provided at that time was "just an estimate" pending this additional

information.  (*Id.*)  This record fails to evidence the Fidelity representatives' awareness of

the true facts as they spoke to Plaintiff.  To the contrary, the representatives appear to be

explicitly ***disclaiming*** their knowledge of all of the pertinent facts needed to accurately

estimate Plaintiff's benefits under the GM Plan.

Moreover, the Sixth Circuit has explained that to satisfy this second element of a

claim of equitable estoppel, a plaintiff must "demonstrate that the defendant's actions

contained an element of fraud, either intended deception or such gross negligence as to

amount to constructive fraud."  *Bloemker,* 605 F.3d at 443 (internal quotation marks,

alteration, and citations omitted).  Here, as noted, the Fidelity representatives consistently

stated that they were providing only estimates, and that they were awaiting further

information needed for a more accurate calculation of Plaintiff's benefits.  Plaintiff, in

turn, repeatedly advised these representatives that he was seeking only an estimate or

"ballpark figure" and that he wouldn't "hold Fidelity to any numbers" provided during

these calls.  (*See, e.g.,* Pl. Record at 123, 126, 150, 166, 184.)  This evidence falls

considerably short of establishing any sort of intended deception or gross negligence

amounting to constructive fraud.  Rather, the most that could be shown under this record

is an "honest mistake," largely of omission, in Defendant Fidelity's failure to alert

Plaintiff that his early retirement from EDS could have ramifications to his eligibility for

interim supplement benefits under the GM Plan, and this sort of mere "misfeasance"

without an intent to deceive falls short of the "malfeasance that estoppel requires."
*Crosby,* 480 F.3d at 431.

Next, the Court agrees with Defendants that the record lacks evidence of either
detrimental or justifiable reliance by Plaintiff. As a threshold matter, it is no simple
matter to determine from Plaintiff's briefs precisely what his theory of reliance might be.
To the extent that his claim of reliance rests upon his decision to accept EDS's offer of
early retirement, this decision was already made before Plaintiff was ever informed,
whether orally or in writing, that he might be entitled to interim supplement benefits. As
noted earlier, there simply is nothing in the record that could be construed as a direct
assurance, during the period preceding this early retirement decision, that Plaintiff's
eligibility for interim supplement benefits under the GM Plan would not be affected by
his acceptance of the EDS offer. Rather, the first statements — both oral, (*see* Pl. Record
at 242), and written, (*see id.* at 30-31) — that disclosed Plaintiff's purported eligibility for
these benefits came several weeks after he had accepted this offer. Thus, Plaintiff cannot
establish any detrimental reliance on representations that post-dated the act purportedly
evidencing this reliance — *i.e.,* his acceptance of EDS's early retirement offer.

Even assuming the oral representations that pre-dated this acceptance could be
viewed as misleadingly assuring Plaintiff, largely through omission, that his early
retirement from EDS would have no adverse effect upon his benefit payments under the
GM Plan, Plaintiff nonetheless has failed to produce evidence of his detrimental reliance
on these representations. Quite simply, even if Fidelity representatives had flatly told

40

Plaintiff that his early retirement from EDS would preclude him from attaining the 85 points needed to become eligible for interim supplement benefits, there is nothing in the record — apart from the bare, unsupported assertions of Plaintiff's counsel, (*see* Plaintiff's Motion, Br. in Support at 15; Plaintiff's Response Br. at 9) — that supports the proposition that Plaintiff would have declined EDS's offer of early retirement and continued to work. To be sure, had Plaintiff done so, his age at the time of retirement plus his 25.75 years of GM service would soon have exceeded the 85 points needed to collect interim supplement benefits under the GM Plan, at least until he reached the age of 62 years and 1 month. Yet, this increase in benefits under the GM Plan (at least for a while) would have been offset by the benefits Plaintiff chose to forgo under EDS's early retirement offer — including, of course, both monetary benefits and the benefit of no longer working. As Defendants correctly observe, the EDS early retirement benefits and GM Plan interim supplement benefits were "mutually exclusive," and Plaintiff could not have taken advantage of one without surrendering the other. (Defendants' Response Br. at 16.) Plaintiff and his counsel have failed to suggest any basis, apart from rank speculation, for the Court to conclude that the presence or absence of interim supplement payments as a component of Plaintiff's overall benefits under the GM Plan was such a significant factor that it would have influenced Plaintiff's decision whether to accept EDS's offer of early retirement.

Alternatively, Plaintiff seems to suggest at some points in his briefs that he relied on Defendant Fidelity's misrepresentations as to his eligibility for interim supplement

41

benefits in making his decision to begin collecting benefits under the GM Plan in early

2008, shortly after his retirement from EDS, rather than waiting until some point in the

future to begin collecting these benefits.[17]  This claim, however, is likewise defeated by

the absence of evidence of detrimental reliance.   It is true that when Plaintiff completed

paperwork in late January of 2008 stating that he wished to commence his benefits under

the GM Plan, this election was based on a benefit calculation he had received that

included interim supplement benefits.  (*See* Pl. Record at 30-31, 1/14/2008 Benefit

Modeling Statement at 4-5.)  Yet, in processing this election, the GM Benefits and

Service Center determined that the benefit calculation given to Plaintiff had been

erroneously based on an EDS termination date of February 29, 2008, rather than the

correct termination date of December 1, 2007.  The Center then issued a revised benefit

calculation that omitted the interim supplement benefits, (*see* Pl. Record at 56-57,

2/12/2008 Benefit Modeling Statement at 4-5), and Plaintiff reaffirmed his decision to

commence these benefits, (*see* Admin. Record at 84), despite the reduced estimate of the

amount of these benefits.  Thus, while Plaintiff's initial decision to begin receiving

benefits under the GM Plan rested upon misinformation as to his eligibility for interim

---

[17]As Defendants point out, and as Plaintiff was advised during his phone calls with
Fidelity representatives, Plaintiff's EDS retirement and his election to commence benefits under
the GM Plan were two separate and independent events.  Nothing in the GM Plan required
Plaintiff to immediately begin collecting benefits under this Plan upon his retirement from EDS.
To the contrary, Plaintiff was told by Fidelity representatives that he could accept EDS's early
retirement offer while still postponing his commencement of benefits under the GM Plan, and
that an "age reduction" factor would no longer apply if he deferred this commencement of GM
Plan benefits until he reached the age of 62 years and 1 month.  (*See* Pl. Record at 201-02, 212-
13, 221.)

supplement benefits, he nonetheless adhered to this decision upon being given the correct information.  This defeats any possible claim of detrimental reliance on the erroneous information Plaintiff initially received from Defendant Fidelity.

Nor does the record establish Plaintiff's justifiable reliance on the representations made to him by Defendant Fidelity.  As noted, the statements of Fidelity representatives during their phone conversations with Plaintiff were couched in terms of estimates, and Plaintiff was advised that Fidelity was awaiting additional information from EDS in order to provide a more accurate calculation of his GM Plan benefits.   Moreover, Plaintiff himself acknowledged during these calls that he was seeking only ballpark figures and would not hold Fidelity to the estimates it was providing.  Then, when Plaintiff received a written benefit calculation that included an interim supplement component, this statement disclosed on its face that it rested on an assumption that Plaintiff knew was not true — namely, a termination date of February 29, 2008, rather than his actual retirement date of December 1, 2007.  (*See* Pl. Record at 29, 1/14/2008 Benefit Modeling Statement at 3.) Justifiable reliance cannot be shown under this record.

In addition, the Sixth Circuit has recognized that a "party's reliance can seldom, if ever, be reasonable or justifiable if it is inconsistent with the clear and unambiguous terms of plan documents available to or furnished to the party."  *Sprague,* 133 F.3d at 404; *see also Livick v. Gillette Co.,* 524 F.3d 24, 31 (1st Cir. 2008) (observing that where a plan provision is clear and unambiguous, "an informal statement in conflict with it is in effect purporting to *modify* the plan term, rendering any reliance on it inherently

43

unreasonable"); *Mello,* 431 F.3d at 447 (5th Cir. 2005) (noting the "clear and consistent case law forbidding recognizing reasonable reliance on informal documents in the face of unambiguous Plan terms").  Thus, in *Cataldo,* 676 F.3d at 554, the Sixth Circuit held that the plaintiffs had failed to state a claim of equitable estoppel because they had not "alleged that the plan documents are ambiguous on the point at issue," but to the contrary were "admittedly aware of *precisely how* their benefits would be calculated under the plan."  Likewise, in this case, Plaintiff does not contend that the operative GM Plan language governing a participant's entitlement to interim supplement benefits is ambiguous or especially difficult to apply to his circumstances.  *Compare Bloemker,* 605 F.3d at 443 (finding that the plaintiff had adequately pled justifiable reliance where he "allege[d] that it would have been impossible for him to determine his correct pension benefit given the complexity of the actuarial calculations and his lack of knowledge about the relevant actuarial assumptions").  To the contrary, he faults Defendants for failing to "simply advise[]" him of "three (3) key facts" that determined whether he was entitled to interim supplement benefits:  (i) his hiring date at GM, (ii) his years of credited service at the time he separated from GM, and (iii) his early retirement date from EDS.  (Plaintiff's Motion at ¶ 29.)  From these facts — each of which was indisputably known to Plaintiff — Plaintiff acknowledges that it is a straightforward matter to determine that "[h]is age plus years of GM . . . credited service totaled 84.79 (less than 85)," so that he was "therefore not eligible to receive an interim supplement."  (*Id.*)  This absence of ambiguity or complexity in the pertinent terms of the GM Plan precludes Plaintiff from

establishing the justifiable reliance element of his claim of equitable estoppel.

Finally, the Court agrees with Defendants that this case presents no "extraordinary circumstances in which the balance of equities strongly favors the application of estoppel." *Bloemker,* 605 F.3d at 444.  As observed earlier, if Plaintiff had been accurately and fully informed in his phone calls with Fidelity representatives as to the effect of his early retirement from EDS on his eligibility for interim supplement benefits, he could not have chosen any course of action that would have secured ***both*** the EDS early retirement benefits ***and*** interim supplement benefits under the GM Plan.  Quite simply, he had to choose one or the other.  To recognize a claim of equitable estoppel under these facts would give Plaintiff an unwarranted windfall, providing him with two sets of mutually exclusive benefits that would not be available to any other Plan participant under the same or comparable circumstances.

The Court recognizes that the decision whether to leave a job and take an early retirement — particularly where, as here, an employee has worked for the same company for a number of years — is a difficult and stressful one, and that many factors, personal and professional, must be weighed in this decision, often in a relatively short period of time.  Given this, the Court can well appreciate that Plaintiff was understandably frustrated with his inability, despite his repeated and diligent efforts, to timely obtain all of the information and benefit estimates needed for him to make a fully informed decision whether to accept EDS's offer of early retirement.  Moreover, the Court does not condone the degree of delay, runaround, and equivocation that Plaintiff faced as he contacted the

45

GM Benefits and Service Center, stressed the urgency of his situation, and sought clear and straightforward appraisals of the amounts of GM Plan benefits he could collect under various scenarios.  The performance of the call center representatives who responded to Plaintiff's inquiries and provided him with information was certainly less than optimal.  Nonetheless, while the Sixth Circuit has now recognized a claim of equitable estoppel in ERISA pension benefit cases, the standard for establishing such a claim remains high.  In this case, the evidence presented by Plaintiff fails as a matter of law, and in a number of respects, to meet this exacting standard.

**E.     Plaintiff's State-Law Claims Are Preempted by ERISA.**

Finally, to the extent that Plaintiff's complaint can be construed as asserting state-law claims through which he seeks to recover monetary damages tied to the benefits that he believes were wrongfully withheld from him under the GM Plan, Defendant correctly points out that any such state-law claims are preempted by ERISA.  *See Bloemker,* 605 F.3d at 440; *Ramsey v. Formica Corp.,* 398 F.3d 421, 424-25 (6th Cir. 2005).  Plaintiff does not contend otherwise in his response to Defendants' motion, but instead states only (and unhelpfully) that he "defers to this Court's sound judgment" in resolving this issue. (Plaintiff's Response Br. at 26.)  Accordingly, any state-law theories of recovery asserted by Plaintiff are preempted.

## IV.  <u>CONCLUSION</u>

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that Defendants' May 29, 2012 motion to affirm administrator's decision and motion in limine (docket # 30) is GRANTED IN PART, to the extent that Defendants seek an order affirming the plan administrator's decision and granting summary judgment in their favor on Plaintiff's remaining claims, and DENIED IN PART, to the extent that Defendants seek an order strictly limiting the Court's review to the administrative record as it existed at the time of the plan administrator's final benefit determination.

Next, IT IS FURTHER ORDERED that Plaintiff's May 29, 2012 motion to

reverse the decision of the plan administrator (docket #29) is DENIED.

                        s/Gerald E. Rosen_____
                        Chief Judge, United States District Court

Dated:  March 7, 2013

I hereby certify that a copy of the foregoing document was served upon the parties and/or
counsel of record on March 7, 2013, by electronic and/or ordinary mail.

                        s/Julie Owens_____
                        Case Manager